# 25-1860

*To Be Argued By*:
REBECCA S. TINIO

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 25-1860

STATE OF NEW YORK, STATE OF ARIZONA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NORTH CAROLINA, STATE OF OREGON,

*(Caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLANTS

JAY CLAYTON,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for Defendants-Appellants.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2774

REBECCA S. TINIO,
BENJAMIN H. TORRANCE,
  *Assistant United States Attorneys,*
    *Of Counsel.*

STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF
WISCONSIN,

*Plaintiffs-Appellees,*

—v.—

DONALD J. TRUMP, in his official capacity as President of the
United States, UNITED STATES DEPARTMENT OF THE
TREASURY, SCOTT BESSENT, in his official capacity as Secretary
of the Treasury,

*Defendants-Appellants.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . 2

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . 3

Issues Presented for Review . . . . . . . . . . . . . . . . . . 3

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  Procedural History . . . . . . . . . . . . . . . . . . . . 3

    B.  Factual Background . . . . . . . . . . . . . . . . . . . 4

        1.  Executive Order 14,158 . . . . . . . . . . . . 4

        2.  The Treasury DOGE Team and
            Engagement Plan . . . . . . . . . . . . . . . . . 6

        3.  The States' Lawsuit . . . . . . . . . . . . . . . 9

        4.  The February Preliminary
            Injunction . . . . . . . . . . . . . . . . . . . . . . 11

        5.  The April and May Orders
            Modifying the PI . . . . . . . . . . . . . . . . 13

        6.  Other Cases Challenging DOGE
            Access to Federal Agency Systems . . . 15

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . 17

POINT I—The States Lack Standing . . . . . . . . . . . 18

ii

PAGE

POINT II—The States Did Not Allege Reviewable
    Final Agency Action . . . . . . . . . . . . . . . . . . . . . .  28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

iii

# TABLE OF AUTHORITIES

*Cases*:

*Agudath Israel of America v. Cuomo*,
 980 F.3d 222 (2d Cir. 2020) . . . . . . . . . . . . . . 18, 28

*Air Brake Systems, Inc. v. Mineta*,
 357 F.3d 632 (6th Cir. 2004) . . . . . . . . . . . . . . . . 33

*American Federation of Teachers v. Bessent*,
 152 F.4th 162 (4th Cir. 2025). . . . . . 16, 27, 35, 37

*American Federation of Teachers v. Bessent*,
 No. 25-1282, 2025 WL 1023638
 (4th Cir. Apr. 7, 2025). . . . . . . . . . . . . . . . . . . . . . 15

*Barclift v. Keystone Credit Services, LLC*,
 93 F.4th 136 (3d Cir. 2024) . . . . . . . . . . . . . . . . 24

*Baur v. Veneman*,
 352 F.3d 625 (2d Cir. 2003) . . . . . . . . . . . . . . . . 19

*Bennett v. Spear*,
 520 U.S. 154 (1997). . . . . . . . . . . . . . . . 29, 32, 33

*Bohnak v. Marsh & McLennan Cos.*,
 79 F.4th 276 (2d Cir. 2023) . . . . . . . . . . 21, 23, 26

*Cacchillo v. Insmed, Inc.*,
 638 F.3d 401 (2d Cir. 2011) . . . . . . . . . . . . . . . . 19

*City of New York v. U.S. Department of Defense*,
 913 F.3d 423 (4th Cir. 2019) . . . . . . . . . . . . . . . . 31

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013). . . . . . . . . . . . . . . . . . . . . 20, 26

iv

PAGE

*Do No Harm v. Pfizer Inc.*,
126 F.4th 109 (2d Cir. 2025) . . . . . . . . . . . . . . . 19

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) . . . . . . . . . . . . . . 18

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024). . . . . . . . . . . . . . . . . . . . . 19, 26

*Flue-Cured Tobacco Coop.*
*Stabilization Corp. v. EPA*,
313 F.3d 852 (4th Cir. 2002) . . . . . . . . . . . . . . . 34

*FTC v. Standard Oil Co.*,
449 U.S. 232 (1980). . . . . . . . . . . . . . . . . . . . . . 34

*Fund for Animals, Inc. v. U.S.*
*Bureau of Land Management*,
460 F.3d 13 (D.C. Cir. 2006). . . . . . . . . . 29, 30, 36

*Hunstein v. Preferred Collection &*
*Management Services, Inc.*,
48 F.4th 1236 (11th Cir. 2022). . . . . . . . . . . . . . 24

*Invention Submission Corp. v. Rogan*,
357 F.3d 452 (4th Cir. 2004) . . . . . . . . . . . . . . . 34

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992). . . . . . . . . . . . . . . . . . . . . . 20

*Lujan v. National Wildlife Federation*,
497 U.S. 871 (1990). . . . . . . . . . . . . . . . 29, 30, 31

*Munaf v. Geren*,
553 U.S. 674 (2008). . . . . . . . . . . . . . . . . . . . . . 18

v

PAGE

*Murthy v. Missouri,*
    603 U.S. 43 (2024) . . . . . . . . . . . . . . . . . . . . . . 18, 26

*NTEU v. Vought,*
    149 F.4th 762 (D.C. Cir. 2025) . . . . . . . . . . . 30, 37

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) . . . . . . . . . . . . . . . . . . . . . . 20

*Pursuing America's Greatness v. FEC,*
    831 F.3d 500 (D.C. Cir. 2016) . . . . . . . . . . . . . . . 18

*Raines v. Byrd,*
    521 U.S. 811 (1997) . . . . . . . . . . . . . . . . . . . . . . 19

*Sackett v. EPA,*
    566 U.S. 120 (2012) . . . . . . . . . . . . . . . . . . . . . . 33

*Safety Equipment Ass'n, Inc. v. EPA,*
    837 F.2d 1115 (D.C. Cir. 1988) . . . . . . . . . . . . . . 34

*Sierra Club v. EPA,*
    955 F.3d 56 (D.C. Cir. 2020) . . . . . . . . . . . . . . 33, 34

*Social Security Administration v. AFSCME,*
    145 S. Ct. 1626 (2025) . . . . . . . . . . . . . . . 15, 36, 37

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) . . . . . . . . . . . . . . . . . . . . . . 20

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) . . . . . . . . . . . . . . . . . . . *passim*

*Trump v. Boyle,*
    145 S. Ct. 2653 (2025) . . . . . . . . . . . . . . . . . . . . 36

*U.S. Army Corps of Engineers v. Hawkes Co.,*
    578 U.S. 590 (2016) . . . . . . . . . . . . . . . 29, 32, 33, 34

vi

PAGE

*United States v. Texas,*
    599 U.S. 670 (2023) . . . . . . . . . . . . . . . . . . . . . . . 19

*Valley Forge Christian College v. Americans United*
    *for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) . . . . . . . . . . . . . . . . . . . . . . . 19

*Venetian Casino Resort, LLC v. EEOC,*
    530 F.3d 925 (D.C. Cir. 2008) . . . . . . . . . . . . . . . 35

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) . . . . . . . . . . . . . . . . . . . . 20, 27

*Zesty Paws LLC v. Nutramax Laboratories, Inc.,*
    157 F.4th 194 (2d Cir. 2025) . . . . . . . . . . . . . . . . 18

*Statutes*:

5 U.S.C. § 551 . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31

5 U.S.C. § 552a . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

5 U.S.C. § 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 30

5 U.S.C. § 3109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

18 U.S.C. § 202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

28 U.S.C. § 1292 . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Regulations*:

5 C.F.R. § 213.3302 . . . . . . . . . . . . . . . . . . . . . . . . . 7

vii

PAGE

85 Fed. Reg. 11,776 (Feb. 27, 2020) . . . . . . . . . . . . 22

*Other Authorities*:

Executive Order 14,158 . . . . . . . . . . . . . . . . . . . . 4, 5, 6

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 25-1860

―――――――――

STATE OF NEW YORK, STATE OF ARIZONA, STATE OF
CALIFORNIA, STATE OF COLORADO, STATE OF
CONNECTICUT, STATE OF DELAWARE, STATE OF HAWAII,
STATE OF ILLINOIS, STATE OF MAINE, STATE OF
MARYLAND, COMMONWEALTH OF MASSACHUSETTS,
STATE OF MINNESOTA, STATE OF NEVADA, STATE OF
NEW JERSEY, STATE OF NORTH CAROLINA, STATE OF
OREGON, STATE OF RHODE ISLAND, STATE OF
VERMONT, STATE OF WISCONSIN,

*Plaintiffs-Appellees,*

—v.—

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES, UNITED STATES
DEPARTMENT OF THE TREASURY, SCOTT BESSENT, IN
HIS OFFICIAL CAPACITY AS SECRETARY OF THE
TREASURY,

*Defendants-Appellants.*

―――――――――

## BRIEF FOR DEFENDANTS-APPELLANTS

―――――――――

2

## Preliminary Statement

In January 2025, the Department of the Treasury hired new employees from outside the agency, with the goal of modernizing its payment systems. These individuals were hired as members of the Treasury Department of Government Efficiency ("DOGE") Team. To enable the Treasury DOGE Team to perform its mission, the Bureau of the Fiscal Service ("BFS") within Treasury developed an "engagement plan" to let the team conduct an end-to-end review of various Treasury payment systems and identify opportunities to improve them.

Plaintiffs—nineteen states—brought this action under the Administrative Procedure Act ("APA"), alleging that granting these employees access to sensitive information was unlawful. The district court granted a preliminary injunction in the states' favor, blocking Treasury from granting any DOGE-affiliated employee access to any Treasury payment records, payment systems, or other data systems. That was error, and this Court should vacate the injunction. To begin with, the states lack standing to bring this suit: the harm they allege, a risk of improper disclosure of their sensitive information, is not sufficiently concrete or imminent to meet the Supreme Court's test for an injury in fact. And the agency decision the states challenge, consisting of hiring new employees and granting them access to agency data systems, is a routine internal management decision—not the kind of "agency action," much less a "final agency action," that can be reviewed by courts under the APA. Accordingly, the states are unable to establish that they are likely to

3

prevail on the merits of this case, and the preliminary injunction was improperly granted.

## Jurisdictional Statement

As explained below, the district court lacked jurisdiction over this action, which plaintiffs invoked under 28 U.S.C. § 1331. On February 21, 2025, the district court entered a preliminary injunction. (Special Appendix ("SPA") 1). On April 11, 2025, and May 27, 2025, the district court entered orders modifying the February 21 preliminary injunction. (SPA 65, 96). The government timely filed a notice of interlocutory appeal on July 28, 2025. (Joint Appendix ("JA") 323). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## Issues Presented for Review

1. Whether the district court lacked jurisdiction because the plaintiff states do not have standing.

2. Whether the district court erred in determining that Treasury's hiring of employees from outside the agency and provision of data systems access to those individuals constituted reviewable final agency action under the APA.

## Statement of the Case

### A. Procedural History

The states commenced this action on February 7, 2025. (JA 10). On February 8, 2025, the district court entered a temporary restraining order. (JA 33). The states then sought a preliminary injunction, which the

4

district court granted on February 21, 2025. (SPA 1).
On April 11, 2025, the district court granted the gov-
ernment's motion to partially dissolve the preliminary
injunction. (SPA 65). On May 27, 2025, the district
court issued a further order denying the government's
motion to dissolve the preliminary injunction in its en-
tirety, but modifying the injunction. (SPA 96). This ap-
peal followed. (JA 323).

## B. Factual Background

### 1. Executive Order 14,158

On January 20, 2025, President Trump signed
Executive Order 14,158, establishing the Department
of Government Efficiency to implement the President's
"18-month DOGE agenda" by "modernizing Federal
technology and software to maximize governmental
efficiency and productivity." Exec. Order No. 14,158,
§§ 1, 3(b), 90 Fed. Reg. 8441, 8441 (Jan. 20, 2025) (the
"E.O."). The E.O. renamed the preexisting United
States Digital Service as the United States DOGE
Service ("USDS"), moved it out of the Office of Man-
agement and Budget, and established it within the
Executive Office of the President. The E.O. also estab-
lished within USDS a temporary organization known
as "the U.S. DOGE Service Temporary Organization."
*Id.* §§ 3(a), (b).

The E.O. directs the highest-ranking official in
each agency to establish "within their respective Agen-
cies" a "DOGE Team" consisting of at least four
"employees" (which may include special government
employees). *Id.* §§ 2(b), 3(c). The E.O. further charges
a "USDS Administrator" with "commenc[ing] a

5

Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." *Id.* § 4(a). And the E.O. directs the USDS Administrator to collaborate with agency heads to modernize the technology and software infrastructure to "promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization." *Id.*

To accomplish those objectives, the E.O. also directs the USDS Administrator and agency heads to work together to ensure, "to the maximum extent consistent with law," that "USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." *Id.* § 4(b). And it provides that "USDS shall adhere to rigorous data protection standards." *Id.*

The E.O. addresses the government's well-documented, urgent need to update and improve its information technology systems to promote efficiency and identify fraud. The Government Accountability Office ("GAO") has found that "improper payments and fraud are long-standing and significant problems in the federal government," with "cumulative improper payment estimates by executive branch agencies" totaling about $2.7 trillion since fiscal year 2003. GAO, GAO-24-107660, *Payment Integrity: Significant Improvements Are Needed to Address Improper Payments and Fraud*, at I (Sept. 10, 2024), https://perma.cc/XC6R-DXK8. Specifically as to Treasury's systems, the GAO identified "[c]ertain deficiencies in

6

internal control over financial reporting" and noted that "information systems modernization efforts . . . should aid in remediating the information systems [sic] significant deficiency," among other issues. GAO, GAO-23-104786, *Financial Audit: Bureau of the Fiscal Service's FY2022 Schedules of the General Fund*, at 1, 5 (Mar. 2023), https://www.gao.gov/assets/gao-23-104786.pdf. The GAO also noted areas for improvement in the BFS's systems related to identifying and tracing transactions to determine whether they were complete and properly recorded. *Id.*

## 2. The Treasury DOGE Team and Engagement Plan

Treasury's Bureau of the Fiscal Service ("BFS") manages the federal government's accounting, central payment systems, and public debt, and serves as the central payment clearinghouse for the vast majority of payments to and from federal agencies. (JA 97-98). BFS operates multiple payment and accounting systems, each of which performs critical functions in the federal government's financial infrastructure. (JA 138-39). Numerous BFS employees, contractors, and others access these systems to process trillions of dollars of payments from the federal government every year, and to provide routine and emergency maintenance and operational support. (JA 99-100).

In accordance with the E.O., Treasury created the Treasury DOGE Team. (JA 125-26). The Treasury DOGE Team initially had two members: Thomas H. Krause, Jr., the DOGE Team Lead; and Marko Elez, a technical specialist. (JA 126). On January 23, 2025,

7

Krause was appointed as a consultant for Treasury in accordance with 5 U.S.C. § 3109, and later converted into a Temporary Transitional Schedule C appointee under 5 C.F.R. § 213.3302. (JA 113, 150, 314). In the latter role, Krause assumed the duties of the Fiscal Assistant Secretary and oversaw the activities of BFS. (JA 127, 150). Krause was also designated a special government employee ("SGE") in accordance with 18 U.S.C. § 202. (JA 113). An SGE, as relevant here, is an officer or employee of the executive branch "who is retained, designated, appointed, or employed to perform, with or without compensation, for not to exceed one hundred and thirty days during any period of three hundred and sixty-five consecutive days." 18 U.S.C. § 202. SGEs are exempted from certain criminal conflict-of-interest prohibitions. *See, e.g.*, *id.* §§ 203(c), 205(c).

Elez, a software engineer, was designated as a Special Advisor for Information Technology and Modernization. (JA 115). Elez was also appointed to a Temporary Transitional Schedule C position, but was not an SGE. (JA 115). His role was to conduct "special and confidential studies" on Treasury's IT systems and make recommendations to "strengthen Treasury's hardware and software." (JA 115). Elez resigned from his appointment at Treasury on February 6, 2025. (JA 116).

Once the Treasury DOGE Team was created, BFS "develop[ed] and implement[ed] a 4–6 week payment process engagement plan" to support the Team (the "Engagement Plan"). (JA 120). The Engagement Plan aimed to provide Treasury DOGE Team members with

8

"insight into the full, end-to-end payment process across multiple BFS payment systems," so they could "identify data gaps that, if resolved, would make the system . . . work more efficiently and securely," as well as "opportunities to advance payment integrity and fraud reduction goals." (JA 130, 138). Because this work would require review of BFS system source code and the ability to review sensitive payment data, which could present risks that are inherent to any user access to sensitive IT systems, BFS recommended and implemented multiple mitigation measures. (JA 131-32, 139-40). Among others, these measures included providing Elez with a secure and monitored BFS laptop, limiting Elez to read-only access to certain BFS systems known as Payment Automation Manager ("PAM") and the Secure Payment System ("SPS"), and creating a "separate, secure coding environment" (termed a "sandbox") in which Elez could work with a copy of some BFS source code without directly affecting BFS's live systems. (JA 140-43). Additionally, Krause was limited to "over the shoulder" access to review BFS systems and source code while they were accessed by authorized persons. (JA 138).

While this litigation proceeded, the Treasury DOGE Team added members, as contemplated by the E.O.: Linda Whitridge, Ryan Wunderly (who replaced Elez following his resignation), Samuel Corcos, Gavin Kliger (who was a temporary detailee to the Internal Revenue Service from the Office of Personnel Management), and Todd Newnam. (JA 296-97). The government also disclosed during the litigation that following Elez's departure, BFS conducted a forensic review of Elez's activity during the short period he was a

9

member of the Treasury DOGE Team, and identified limited issues. (JA 142-44, 253-54). First, career BFS employees inadvertently gave Elez read/write access for one day to the SPS database, although there is no indication that Elez ever knew that he had been given that access or that he made use of it. (JA 143-44). Second, BFS determined that Elez sent an email with a spreadsheet containing some personally identifiable information ("PII") to individuals at another federal agency, contrary to BFS policies (because the email was not sent encrypted and Elez did not correctly obtain prior approval of the transmission). (JA 253-54). BFS considered the PII that Elez transmitted to be "low risk," because it was not accompanied by more specified identifiers. (JA 254). However, in response to this incident, BFS implemented additional training regarding BFS policies with respect to Treasury DOGE Team members. (JA 254).

### 3. The States' Lawsuit

On February 7, 2025, the plaintiff states filed a complaint and request for injunctive relief, challenging Treasury's implementation of the Engagement Plan, including its grant of limited access to BFS systems to the Treasury DOGE Team. (JA 37). The states asserted six claims under the APA and the Constitution. (JA 82-91).[1] First, the states alleged that

_____

[1] On May 23, 2025, the states filed an amended complaint, which is not relevant here. (JA 30). Defendants' motion to dismiss the amended complaint is pending before the district court.

10

defendants violated the APA by acting contrary to law and in excess of its statutory authority "under the statutes that govern the collection, storage, handling, and disclosure of [personally identifiable information] and confidential financial information." (JA 82-86). The states also alleged that defendants acted arbitrarily and capriciously in failing to consider the numerous privacy and security problems associated with the engagement plan, in violation of the APA. (JA 86-87). Last, the states asserted that defendants acted *ultra vires*, violated the constitutional separation of powers by blocking legislatively appropriated and authorized federal funding, and violated the Take Care Clause. (JA 87-91).

Shortly after filing the original complaint, the states obtained an *ex parte* temporary restraining order ("TRO") from the district court. (JA 33). The TRO restrained defendants from granting access to certain Treasury records or systems "other than to civil servants with a need for access to perform their job duties within [BFS] who have passed all background checks and security clearances and taken all information security training called for" (and particularly barred "all political appointees, [SGEs], and government employees detailed from an agency outside" Treasury from access). (JA 35). On February 11, 2025, the district court modified the TRO to exclude from its restrictions "any Officer of [Treasury] nominated by the President and confirmed by the United States Senate," and contractors and certain other individuals who had or were approved to have access to BFS systems prior to January 20, 2025. (JA 110).

11

### 4. The February Preliminary Injunction

On February 21, 2025, the district court issued a preliminary injunction against defendants. (SPA 1 (the "February PI Order")). The February PI Order restrained Treasury "from granting access to any Treasury Department payment record, payment systems, or any other data systems maintained by the Treasury Department containing personally identifiable information and/or confidential financial information of payees to any employee, officer or contractor employed or affiliated with the United States DOGE Service, DOGE, or the DOGE Team established at the Treasury Department." (SPA 63).

The district court first determined that the states have Article III standing to challenge the "unauthorized disclosure" of the states' "confidential information," via granting access to BFS systems to members of the Treasury DOGE Team. (SPA 22-31). The district court determined that the states "have adequately alleged both past harm in the unauthorized disclosure of the States' confidential financial information to the DOGE Team, and the risk of future harm, in the risk of exposure of their confidential information to officials of USDS/DOGE and to the public through potential hacking." (SPA 26). The district court analogized the states' alleged injury to the "disclosure of private information," which the court characterized as an "intangible harm" that has been "traditionally recognized as providing a basis for lawsuits in American courts." (SPA 26 (quotation marks omitted)). The district court also concluded that this harm was "imminent," due to defendants' purportedly

12

"inadequate cybersecurity measures," and that the causation and redressability factors were satisfied. (SPA 27-31).

On the merits, the district court determined that the states met the requirements for preliminary injunctive relief only as to their "arbitrary and capricious" claim under the APA. (SPA 50). The court held that for purposes of its APA analysis, the reviewable final agency action was "the decision by the Treasury Department to constitute a DOGE Team with individuals from outside the agency, who were employed pursuant to temporary hiring authorities, and provide those individuals with unprecedented access to the BFS payments systems pursuant to" the Engagement Plan (the "Access Plan"). (SPA 44). The district court concluded that the states had not shown a likelihood of success on the merits of their APA claims based on the Privacy Act, Tax Reform Act and Treasury regulations, E-Government Act, and conflict of interest criminal statutes, or on their constitutional or *ultra vires* claims. (SPA 35-42, 53-58). But the court determined that "Plaintiffs will more likely than not succeed in establishing that the agency's processes for permitting the Treasury DOGE Team access to critical BFS payment systems, with full knowledge of the serious risks that entailed, w[ere] arbitrary and capricious." (SPA 50). At the same time, the February PI Order did not suggest that the substance of Treasury's implementation of the Engagement Plan was impermissible; to the contrary, the district court held that the states were not likely to succeed on the merits of any of their claims challenging the substance of the Engagement Plan and the granting of access to Treasury systems

13

contemplated by the Plan, and opined that "the issues identified by the Court largely have to do with the processes followed by the agency, and not with the substance of its decisions." (SPA 62).

Recognizing the ongoing nature of Treasury's implementation of the Engagement Plan, the February PI Order directed the government to submit information about Treasury procedures and protocols used to oversee members of the Treasury DOGE Team, including the relevant vetting, training, hiring authorities, reporting lines, and mitigation measures associated with the Team's work, with a view toward the potential modification or termination of the February PI. (SPA 63-64). Over the next several weeks, defendants submitted numerous additional agency declarations providing the requested information and explaining that Treasury DOGE Team members were Treasury employees (or detailees) subject to the same hiring, vetting, and training processes as any other person granted access to BFS systems (and in certain respects, more stringent protocols and requirements). (JA 218-48, 251-322).

## 5. The April and May Orders Modifying the PI

In subsequent orders, the district court modified but did not fully dissolve the February PI.[2] In April 2025, following the government's submission of

———

[2] On March 7, 2025, the district court clarified that the February PI's restrictions did not apply to a particular software application used by the Internal Revenue Service. (JA 249-50).

14

numerous declarations detailing BFS's adherence to hiring, vetting, training, and mitigation protocols with regard to the members of the Treasury DOGE Team that were equivalent to, and in some regards more stringent than, those applied to other individuals who access BFS systems, the district court granted the government's motion to partially dissolve the February PI to allow Treasury DOGE Team member Ryan Wunderly to access BFS payment systems. (SPA 65). The district court commented that the "Government's extensive submissions, set forth in 12 declarations spanning 54 pages, largely alleviate[d]" the court's prior concerns about hiring procedures, training processes, vetting and clearance processes, and the sufficiency of mitigation measures. (SPA 83). The district court warned that the "APA is not an invitation for the Court to micromanage the minutiae of the Treasury Department's day-to-day operations in the manner suggested by Plaintiffs." (SPA 83).

Defendants moved to entirely dissolve the preliminary injunction on May 1, 2025. (JA 29). The district court denied the motion, maintaining the injunction, but noted that "there is little utility in having this Court function as Treasury's de facto human resources officer each time a new team member is onboarded." (SPA 96, 101). Accordingly, while the district court kept in place a default restriction against permitting Treasury DOGE Team members (or individuals associated with the Team) access to certain Treasury payment systems, the district court ruled that these individuals could nevertheless access BFS systems if they complied with the procedures and protocols that defendants had previously described to the court.

15

(SPA 101-02). Further, any new Treasury DOGE Team members could, in the future, access BFS systems under these conditions without separate judicial determination. (SPA 102).

### 6. Other Cases Challenging DOGE Access to Federal Agency Systems

A number of cases challenging the access of agency DOGE Teams to federal agency systems and data are pending in other jurisdictions.

In *Social Security Administration v. AFSCME*, 145 S. Ct. 1626 (2025), the Supreme Court granted the government's motion to stay the preliminary injunction entered by a district court, which had restricted access by members of the Social Security Administration ("SSA") DOGE Team to SSA systems and records. The Supreme Court held that pending disposition of the government's appeal on the merits in the Fourth Circuit, "SSA may proceed to afford members of the SSA DOGE Team access to the agency records in question in order for those members to do their work." *Id.* The parties in *SSA v. AFSCME* are awaiting the Fourth Circuit's *en banc* decision on the government's appeal of the preliminary injunction. *AFSCME v. SSA*, No. 25-1411 (4th Cir.).

The plaintiffs in *American Federation of Teachers v. Bessent* ("*AFT*"), No. 25-1282 (4th Cir.), challenge the access of DOGE-affiliated individuals to the systems and records of three agencies, including Treasury. In *AFT*, the Fourth Circuit granted the government's motion to stay the preliminary injunction entered by the district court, pending appeal. *AFT v.*

16

*Bessent*, No. 25-1282, 2025 WL 1023638, at *1 (4th Cir. Apr. 7, 2025). The Fourth Circuit later vacated the preliminary injunction, holding that the plaintiffs had not shown that they were likely to prevail with regard to all of the issues that they would need to establish to merit preliminary injunctive relief. *AFT v. Bessent*, 152 F.4th 162 (4th Cir. 2025). The plaintiffs' petition for rehearing *en banc* is pending.

## Summary of Argument

The district court erred in granting the preliminary injunction. First, the plaintiff states cannot demonstrate that they are likely to prevail in their lawsuit—a necessary element for obtaining preliminary injunctive relief—because they lack standing. Standing requires that a plaintiff establish that it will suffer a concrete and imminent injury in fact. The harm the states assert does not qualify. The states have alleged they are injured because under the Engagement Plan, additional Treasury employees have been granted access to sensitive information belonging to the states. But it is a routine, permitted, and necessary practice for government agencies to hire new personnel or contractors and grant them access to information so they can do their jobs, and nothing about that practice in itself causes cognizable harm to the plaintiff states. Absent disclosure to someone outside the government, which the states have not alleged, no concrete harm results from the government's internal decisions about access. Nor is there a risk of imminent future harm in this case; the speculative claim that there is a risk of some future disclosure to some unspecified third party

17

is not sufficient for the plaintiff states to demonstrate standing. *See infra* Point I.

The plaintiff states fail to demonstrate likelihood of success for a second reason: the agency decision they challenge is not reviewable under the APA, which only applies to final agency action. An "agency action" within the meaning of the APA does not include agency decisions regarding its own continuing internal or anticipatory operations or programs; the Access Plan, which comprises a series of personnel and access decisions by the agency, is therefore outside the scope of APA review. Moreover, these decisions do not constitute a "final" action, as they determine no one's rights or obligations and no legal consequences for the states flow from it. Rather, the only effects the states allege are indirect and speculative, and therefore do not rise to the level of concreteness that makes the agency decision reviewable. The requirement of final agency action as a prerequisite for APA review prohibits courts from attempting to oversee day-to-day management within agencies, and thus shields the Access Plan from the states' challenge. *See infra* Point II.

Accordingly, the preliminary injunction should be vacated.

# **A R G U M E N T**

## **Standard of Review**

The Court "review[s] de novo the district court's legal conclusions in deciding to grant a motion for a preliminary injunction, but review[s] its ultimate

18

decision to issue the injunction for abuse of discretion." *Zesty Paws LLC v. Nutramax Laboratories, Inc.*, 157 F.4th 194, 197 (2d Cir. 2025) (quotation marks and alterations omitted).

## POINT I

### The States Lack Standing

The district court erred in granting the states' application for a preliminary injunction, because the district court incorrectly concluded that the states had standing under Article III to bring their claims.

A preliminary injunction is "extraordinary and drastic" relief, "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 679-80 (2008) (quotation marks omitted). Movants must "bear the burden of showing that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *Agudath Israel of America v. Cuomo*, 980 F.3d 222, 226 (2d Cir. 2020). When an injunction is sought against the government, the last two factors merge, "because the government's interest *is* the public interest." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016); *accord Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

A party that lacks standing cannot establish likelihood of success and therefore is not entitled to a preliminary injunction. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). "[T]o establish standing for a preliminary

19

injunction, 'a plaintiff cannot rest on such mere allegations as would be appropriate at the pleading stage but must set forth by affidavit or other evidence specific facts, which for purposes of the . . . motion will be taken to be true.'" *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 119 (2d Cir. 2025) (quoting *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011)).

Article III standing is a "bedrock constitutional requirement that [the Supreme] Court has applied to all manner of important disputes." *United States v. Texas*, 599 U.S. 670, 675 (2023). It is "built on a single basic idea—the idea of separation of powers." *Id.* (quotation marks omitted). The requirement that plaintiffs demonstrate standing "helps safeguard the Judiciary's proper—and properly limited—role in our constitutional system," *id.* at 675-76, by ensuring that federal courts do not become "forums for the ventilation of public grievances" more properly resolved through the democratic process, *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982).

To demonstrate Article III standing, a plaintiff must establish an injury that is both "legally and judicially cognizable." *Raines v. Byrd*, 521 U.S. 811, 819 (1997); *see FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 380 (2024) ("[A] plaintiff must demonstrate . . . that she has suffered or likely will suffer an injury in fact . . . ."). "A plaintiff cannot rely solely on conclusory allegations of injury." *Baur v. Veneman*, 352 F.3d 625, 637 (2d Cir. 2003). "Standing is not an ingenious academic exercise in the conceivable"; it requires more than "pure speculation" to establish a

20

constitutionally sufficient injury to invoke the jurisdiction of the federal courts. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 566-67 (1992) (quotation marks omitted). As the Supreme Court has repeatedly held, "'allegations of *possible* future injury'" are "'too speculative for Article III purposes'"; a "'threatened injury must be *certainly* impending'" to establish constitutional standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990), and *Defenders of Wildlife*, 504 U.S. at 565 n.2)). A plaintiff who offers only a conjectural chain of possibilities that it alleges will lead to an actual injury has not established its standing. *Whitmore*, 495 U.S. at 156-58; *O'Shea v. Littleton*, 414 U.S. 488, 496-97 (1974). Moreover, standing is "substantially more difficult" for a plaintiff to establish when its theory of standing depends on the actions of third parties. *Defenders of Wildlife*, 504 U.S. at 561-62 (quotation marks omitted).

The harm must also be "'concrete'—that is, 'real, and not abstract.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)). Although "tangible" harms more readily qualify as concrete injuries, certain intangible harms can also be concrete. *Id.* at 425. "Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 417 (quoting *Spokeo*, 578 U.S. at 341). Plaintiffs cannot clear the bar by alleging a bare statutory violation: Congress can create "a statutory prohibition or obligation and a cause of action,"

21

but it may not override Article III's injury require-
ment. *Id.* at 426.

The district court erred in concluding that the
states have asserted sufficient harm to establish
standing. (SPA 22-31). The states asserted, and the
district court adopted, a purely intangible theory of
injury—namely, that a purportedly unauthorized,
expanded group of people at Treasury now has access
to their sensitive bank information and other sensitive
financial data stored on BFS systems, which the dis-
trict court analogized to the "intangible harm" arising
from the "disclosure of private information" that this
Court deemed sufficient for standing in *Bohnak v.
Marsh & McLennan Cos.*, 79 F.4th 276, 286 (2d Cir.
2023). (SPA 26). But the alleged injury in this case is
not sufficient for the states to have standing.

The district court identified both a "past harm in
the unauthorized disclosure of the States' confidential
financial information to the DOGE Team," and a "risk
of future harm, in the risk of exposure of [the states']
confidential information to officials of USDS/DOGE
and to the public through potential hacking." (SPA 26).
Neither of these purported harms suffices to confer
standing on the plaintiff states. Beginning with the
supposed "past harm," the district court never
explained its reference to "the unauthorized disclo-
sure" of the states' information to the Treasury DOGE
Team. (SPA 26). While the establishment of the Treas-
ury DOGE Team was novel, the hiring of a handful of
individuals at Treasury for a particular purpose is not
uncommon, and the district court never held, nor did
the plaintiff states establish, that the Treasury DOGE

22

Team members' employment under various hiring and detail authorities was invalid, improper, or otherwise "unauthorized." The district court also characterized the BFS systems access granted to some members of the Treasury DOGE Team as "unprecedented" (SPA 27), but "unprecedented" is not tantamount to "unauthorized." The district court did not hold—nor could it have—that the plaintiff states, or any other individual or entity that provides its information to BFS, are entitled to withhold "authorization" to access that information from any particular individual who is hired or contracted by Treasury to work in its payment systems.

To the contrary, various System of Records Notices ("SORNs") make clear that agencies may give access to their employees, contractors, and others, as needed, to their systems of records to perform necessary functions. *See* 5 U.S.C. § 552a(b)(1)-(13). The SORN that pertains to Treasury's payment record system states that Treasury employees and others will use the information for the "development of computer systems" and in connection with the "investigation of unauthorized or fraudulent activity." 85 Fed. Reg. 11,776, 11,779 (Feb. 27, 2020). It further provides that the information will be "routine[ly]" shared with, among others, "federal or state agenc[ies], [their] employees, agents (including contractors of its agents) or contractors"; "financial agent[s]" of Treasury; and Treasury "contractors" for the purpose "of identifying, preventing, or recouping improper payments." *Id.* at 11,780. Indeed, numerous BFS employees, contractors, and others regularly access the systems to make payments, perform maintenance, and provide operational

23

support. (JA 99-100). There is accordingly no basis for the district court's conclusion that access by Treasury employees, new or old, was "unauthorized."

To be sure, in Marko Elez's brief time as a member of the Treasury DOGE Team, his transmission of an email containing some PII to another federal agency was determined to be contrary to BFS policies. (JA 253-54). But that in itself would not give rise to a harm sufficient to confer standing on the plaintiff states, because the states have not alleged that any harm actually resulted. Even if this transmission had constituted a statutory violation, which the district court did not hold, *TransUnion* leaves no doubt that a statutory violation is not, by itself, a cognizable injury for purposes of Article III standing. 594 U.S. at 426-27. Rather, "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that . . . defendant over that violation in federal court." *Id.* at 427.

The lack of any such concrete harm in the "past injury" cited by the district court distinguishes this case from *Bohnak* and *TransUnion.* (SPA 26). In *Bohnak*, an unauthorized, malign third-party actor accessed the plaintiff's name and Social Security number through a targeted data breach of her employer; this Court determined that harm had a "common law analog" in "public disclosure of private facts" and was thus "traditionally recognized" as a basis for a lawsuit. 79 F.4th at 280, 285-86 (quotation marks omitted). In *TransUnion*, the Supreme Court examined a major credit reporting company's creation of credit checks that erroneously matched persons with a list

24

maintained by the government of "specially designated nationals who threaten America's national security." 594 U.S. at 419-20 (quotation marks omitted). The *TransUnion* Court drew a distinction between the class of plaintiffs whose inaccurate credit reports had actually been disclosed to creditors, and had thus suffered a concrete injury closely related to the harm associated with defamation, and plaintiffs whose reports—no matter their inaccuracies—were never published, holding that for that subset, there was no historical analogue for a damages suit. *Id.* at 432-34.

Thus, in both cases, the disclosure to an outsider—the malign data thief in *Bohnak* or the legitimate user of information in *TransUnion*—was the basis of the harm that sufficed for the plaintiffs' standing. Here, there is no allegation that any of the states' information was published outside the government, much less that any inaccuracies were disseminated about the states themselves. *See Hunstein v. Preferred Collection & Management Services, Inc.*, 48 F.4th 1236, 1240, 1245-50 (11th Cir. 2022) (en banc) (no cognizable injury from disclosure of private information where plaintiff's information was sent from hospital to collection agency because disclosure was not public; citing cases); Restatement (Second) of Torts § 652D ("Publicity given to private life"); *see also TransUnion*, 594 U.S. at 434 n.6 ("Many American courts did not traditionally recognize intra-company disclosures as actionable publications for purposes of the tort of defamation."). The states have not alleged any public disclosure here; instead, there has been (at most) an exchange internal to the federal government. *See Barclift v. Keystone Credit Services, LLC*, 93 F.4th 136,

25

146 (3d Cir. 2024) ("harm from disclosures that remain functionally internal are not closely related to those stemming from public ones."), *cert. denied*, 145 S. Ct. 169 (2024).

The district court also found a risk of future harm. (SPA 26). But the future harm identified by the district court was too speculative and attenuated to constitute either concrete or imminent injury.[3] The district court characterized the risk as possible "exposure of [the states'] confidential information to officials of USDS/DOGE and to the public through potential hacking." (SPA 26). But again, the district court did not explain why it is *per se* harmful for Treasury DOGE Team members, who are employees of (or detailees to) Treasury, to potentially have access to information in BFS systems, when many other BFS employees and contractors have that access in the course of making trillions of dollars of disbursements to federal payees every year and maintaining the systems that enable those payments. Treasury DOGE Team members—like everyone at BFS—are bound by legal and ethical restrictions on the disclosure of the states' information, including those imposed by the

---

[3] The district court suggested that the result in *TransUnion* "may well have been different if the plaintiff class members had been seeking injunctive relief rather than retrospective damages." (SPA 25). But as the district court recognized, to obtain forward-looking relief, a plaintiff must still establish a "risk of harm [that] is sufficiently imminent and substantial." 594 U.S. at 435.

26

Privacy Act. *See* 5 U.S.C. § 552a(i)(1), (g); *Bohnak*, 79 F.4th at 285 ("core injury" is exposure of information to "unauthorized *third parties*," analogous to "*public disclosure* of private facts" at common law (emphases added)).

And even if mistakes happen on occasion, or even if there are what the district court characterized as "inadequate cybersecurity measures," under *Trans-Union* the plaintiffs must still show actual imminent, concrete harm, not merely the violation of a statute or policy. But any concrete injury here is far removed from actual events, and the states must therefore rely on a speculative series of events in trying to show that such an injury occurred. For the states' theory of imminent future harm to be correct, they would have to demonstrate four elements: that access by the Treasury DOGE Team members will materially increase the risk of disclosure, notwithstanding Treasury's enhanced mitigation efforts in response to the grant of access to the Treasury DOGE Team; that Treasury's information will be compromised; that the states' information specifically will be compromised; and that compromise will cause the states cognizable harm. This "chain of causation is simply too attenuated." *Hippocratic Medicine*, 602 U.S. at 391; *accord Murthy*, 603 U.S. at 57 ("The one-step-removed, anticipatory nature of [plaintiffs'] alleged injuries" fails to satisfy standing); *Clapper*, 568 U.S. at 416. In this respect, the states' allegations are again unlike *Bohnak*, where there had actually been a breach of the plaintiff's information outside of the defendant entity and the plaintiff had incurred actual expenses in response to that breach. *See* 79 F.4th at 285-86. Here,

27

both disclosure and response are entirely speculative and indeed rebutted by the factual record of BFS's security measures. (JA 131-32, 138-44).

For similar reasons, the Fourth Circuit has stated that plaintiffs asserting claims nearly identical to those here "seemingly lack standing." *AFT v. Bessent*, 152 F.4th at 171-72. In that case, the plaintiffs challenged the grant of information-technology access to DOGE-affiliated employees at Treasury and other agencies. *Id.* at 167-68. The Fourth Circuit vacated the district court's preliminary injunction, concluding the plaintiffs could not "show they are ultimately likely to succeed on the merits" because of their lack of standing. *Id.* at 174. The court reasoned that because the plaintiffs had "alleged no public disclosure," they could not establish "an injury with a 'close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.'" *Id.* at 171 (quoting *TransUnion*, 594 U.S. at 425). Because torts rooted in defamation require "disclosure to the public at large," the plaintiffs could not establish that kind of injury; and because there was no disturbance of the plaintiffs' intimate spaces, they could not rely on the tort of intrusion upon seclusion. *Id.* at 172-74. Thus, under either theory, the "unauthorized acquisition of information itself . . . [did not] suffice[] for standing under *TransUnion*." *Id.* at 173.

The same logic applies here, where the district court identified the "disclosure of private information" as the analogue to the plaintiff states' alleged injury. (SPA 26). Because the states allege only that their information may have been improperly accessed within

28

the government or otherwise placed at higher risk simply because of limited access granted to Treasury DOGE Team members, they have failed to demonstrate an injury cognizable under *TransUnion*, and the district court's order should be vacated.[4]

### POINT II

### The States Did Not Allege Reviewable Final Agency Action

The district court additionally lacked authority to resolve the states' claims because only "final agency action" is reviewable under the APA. 5 U.S.C. § 704. The district court defined the challenged agency action (the Access Plan) as "the decision by the Treasury Department to constitute a DOGE Team with individuals from outside the agency, who were employed pursuant to temporary hiring authorities, and provide those individuals with unprecedented access to the BFS payments systems pursuant to" the Engagement Plan. (SPA 44). But an agency's decisions regarding which employees may access particular agency databases do not qualify as final agency action under the APA.

Not all agency conduct is subject to review under the APA. The APA defines "agency action" to include an "agency rule, order, license, sanction, relief, or the

---

[4] For the same reason that they cannot demonstrate harm sufficient to establish standing, the states also cannot meet their burden of showing irreparable harm, as needed to obtain a preliminary injunction. *See Agudath Israel*, 980 F.3d at 226.

29

equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see* 5 U.S.C. § 701(b)(2) (adopting § 551's definition of "agency action" for §§ 701-706). And to be reviewable by courts under the APA, an agency action must be "final." *Id.* § 704. For an agency action to be final, first, it "'must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature'"; second, it "'must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

As the Supreme Court has emphasized, the APA therefore does not permit "general judicial review of [an agency's] day-to-day operations." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 899 (1990). Nor does the APA authorize courts to oversee "the common business of managing government programs." *Fund for Animals, Inc. v. U.S. Bureau of Land Management*, 460 F.3d 13, 20 (D.C. Cir. 2006); *accord id.* at 19 (the APA does not permit "judicial review over everything done by an administrative agency" (quotation marks omitted)).

The states seek review of exactly that kind of day-to-day management of agency operations. The "agency action" that the district court identified, the Access Plan, is a loosely defined series of personnel decisions related to granting individual employees access to agency information systems. (SPA 44). But this "is not an 'agency action' within the meaning of § 702, much less a 'final agency action' within the meaning of

30

§ 704." *National Wildlife Federation*, 497 U.S. at 890. Rather, it is a term that "refer[s] to the continuing . . . operations of the [agency] in reviewing" its own procedures, infrastructure, and decisionmaking, and is thus "no more an identifiable 'agency action' . . . than a 'weapons procurement program' . . . or a 'drug interdiction program.' " *Id.*; *accord Fund for Animals*, 460 F.3d at 19-20 (a "Budget Initiative" that "lays out the key elements of the [agency's] 'strategy' " is not an "agency action"). "Much of what an agency does is in anticipation of agency action," and a "planning document" that "outlines the goals and methods of an administrative program" or states how future decisions are to be considered and made does not qualify as "agency action." *Fund for Animals*, 460 F.3d at 19-20; *see NTEU v. Vought*, 149 F.4th 762, 781-85, 787 (D.C. Cir. 2025) (internal guidance email and putative decision to shut down an agency are not agency actions).

Because the Access Plan merely pertained to the hiring of employees from outside the agency and the grant of various types of access to information systems to those employees, it is akin to the types of planning and anticipatory decisions that do not qualify as "agency action." That conclusion accords with the statutory definition, as the Access Plan does not fit within any of the items listed as "agency action": a "rule, order, license, sanction, relief, or the equivalent." 5 U.S.C. § 551(13). The only conceivable match for what the states challenge is an "order." But the APA defines an "order" to mean "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including

31

licensing." *Id*. §§ 551(6), 701(b)(2). Nothing about the Access Plan meets that definition, as it is not a "disposition" of anything. The Access Plan encompasses instead the type of day-to-day operational decisions and conduct that the Supreme Court in *National Wildlife Federation* advised do not fall within the APA's ambit. 497 U.S. at 899. Courts "are woefully ill-suited . . . to adjudicate" " 'attack[s]' " "asking [the judiciary] to improve an agency's performance or operations." *City of New York v. U.S. Department of Defense*, 913 F.3d 423, 431 (4th Cir. 2019). Where, as here, the courts are asked to engage in that kind of review, they "would be forced either to enter a disfavored 'obey the law' injunction or to engage in day-to-day oversight of the executive's administrative practices. Both alternatives are foreclosed by the APA, and rightly so." *Id*. (citation omitted).

The district court nevertheless concluded that the states' allegations about a loosely defined series of personnel decisions related to granting individual employees access to BFS systems were enough to make out a challengeable "agency action." (SPA 44). But that understanding of what qualifies as "agency action" would have sweeping and untenable consequences. Agencies make thousands of personnel decisions every day of the type the states challenge here, such as staffing an employee on a particular matter, or ensuring that an employee has the relevant training and credentials to access systems or participate in programs. But the district court held that those kinds of decisions —"constitut[ing]" a team and "provid[ing]" computer access to the team members—was "agency action." (SPA 44). A court could not review such decisions

32

without bringing within the scope of the APA virtually every aspect of an agency's relationship with its employees, from initial hiring, to onboarding, to day-to-day oversight—allowing plaintiffs and courts to bring the operations of government to a halt through micromanagement.

Neither the states nor the district court identified any precedent accepting that those kinds of quotidian internal decisions are reviewable "agency action" under the APA. Instead, the district court focused almost exclusively on the requirement of "final" action —disregarding the predicate requirement of "agency action." The court pointed to "[t]he disclosures of confidential information to the Treasury DOGE Team that have already taken place as part of the Engagement Plan, as well as the risk of future disclosures both to those in USDS/DOGE and outside the federal government," and concluded that they were sufficient to show that "legal consequences" flowed from the implementation of the Engagement Plan pursuant to the *Bennett v. Spear* test of finality, 520 U.S. 154, 177-78 (1997). (SPA 46). But even assuming an agency decision increases some risk of disclosure of confidential information—as nearly every government decision regarding access to information will—that does not make it the kind of agency action that courts are permitted to review under the APA.

And in any event, even if the Access Plan constituted "agency action," it fails the finality test. The Access Plan did not "consummat[e] ... the agency's decisionmaking process," *Hawkes*, 578 U.S. at 597 (quotation marks omitted); rather, it contemplated

33

hiring personnel and granting those people access to information to begin a decisionmaking process, *id.* ("interlocutory" decisions are not final agency action (quotation marks omitted)). And the Access Plan did not "determine[ ]" any "rights or obligations" or create "legal consequences." *Id.* (quotation marks omitted). The states argued to the district court that an "increase[ ] [in] data security risk" or a "potential violation of federal law" is a "legal consequence" that makes an agency decision final. (SPA 45-46). But to make an agency action final, the legal consequences must be "'direct and appreciable,'" *id.* at 598 (quoting *Bennett*, 520 U.S. at 178), and "concrete," *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020). A decision that "alter[s] the legal regime" at issue, *Bennett*, 520 U.S. at 178, or "bind[s] the [agency]" or leads to a "risk of significant criminal and civil penalties," *Hawkes*, 578 U.S. at 598-600; *accord Sackett v. EPA*, 566 U.S. 120, 126 (2012) (agency order "exposes [individuals] to double penalties in a future enforcement proceeding" and "limits [their] ability to obtain a permit"), creates the kind of legal consequence that makes an agency action reviewable.

But no authority holds that merely creating risk or practical effects for someone outside the government means "legal consequences" flow from an agency action to make it "final." Adverse effects "accompany many forms of indisputably non-final government action." *Air Brake Systems, Inc. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004) (citing cases). For example, "[i]nitiating an enforcement proceeding against a company . . . may have a devastating effect on the company's business, but that does not make the agency's action final." *Id.*;

34

*accord FTC v. Standard Oil Co.*, 449 U.S. 232, 243 (1980) ("disruptions" resulting from agency complaint not sufficient to permit APA review); *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 460 (4th Cir. 2004) ("adverse effect" of agency action that made challenger's "business more difficult" did not "transform the agency's conduct into final agency action under the APA"); *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 859 (4th Cir. 2002) ("coercive pressures on third parties" not sufficient for "legal consequences" under *Bennett*). The lack of cognizable legal consequences is especially pronounced when the adverse effects result from the actions of third parties. *Flue-Cured Tobacco*, 313 F.3d at 859-60; *Industry Safety Equipment Ass'n, Inc. v. EPA*, 837 F.2d 1115, 1121 (D.C. Cir. 1988). Here, the mere increase in the existing risk that sensitive data will be disclosed and fall into the hands of a third party is not only speculative, it cannot satisfy the "pragmatic" inquiry needed to establish that "direct and appreciable legal consequences" flow from the agency's decisions. *Hawkes*, 578 U.S. at 598-99 (quotation marks omitted); *Sierra Club*, 955 F.3d at 63-64 (quotation marks omitted) (agency decision that "imposes no obligations, prohibitions or restrictions on regulated entities, does not subject them to new penalties or enforcement risks, preserves the discretion of permitting authorities, requires any permitting decision relying on the Guidance be supported with a robust record, and does not prevent challenges to individual permitting decisions" is not final agency action).

And to the extent the district court equated "legal consequences" with a "violation of federal law"

35

(SPA 46), that analysis deviates even further from the proper test for final agency action. A violation of law is a question of the merits in an APA case; in contrast, final agency action is a statutory threshold for review. Nearly all APA actions allege that some agency violated federal law; if that were enough to show "legal consequences," there would be nothing left of the *Bennett* test for finality.

In finding final agency action, the district court (SPA 46-47) likened this case to *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008). In that case, an agency adopted a policy that allowed it to disclose confidential information, provided to it by private entities, to third parties without notice to the entity that provided the information. *Id.* at 927. But an actual adopted policy endorsing affirmative disclosure of sensitive information to nongovernmental third parties is a far cry from the Access Plan, which allowed hiring government employees and gave those employees access to sensitive information—just as other government employees had access to the information. The latter may increase the risk of harm to the owners of the information (like any decision to hire an employee with sensitive access); the former is a clearcut "agency action" that has the legal consequence of diminishing the owners' legal control over its proprietary information. *AFT v. Bessent*, 152 F.4th at 175 ("The disclosure policy in *Venetian Casino* was long-running, agency-wide, conceded to exist by agency counsel, and expressly written down in the agency's formal Compliance Manual—four crucial features all missing from this case. . . . [I]f granting IT access to a handful of employees amounts to a disclosure policy, it

36

is one that looks substantially different from the one in *Venetian Casino*.").

More recent decisions have cast doubt on similar claims of reviewable final agency action. In *SSA v. AFSCME*, the Supreme Court stayed a preliminary injunction and determined that "SSA may proceed to afford members of the SSA DOGE Team access to . . . agency records," including "software systems" and "IT systems," "in order for those members to do their work," a precedent that is closely on point given the congruence between the "systems access" claims in that case and here. 145 S. Ct. 1626, 1626 (2025); *see Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (Supreme Court decisions on interim relief "inform how a court should exercise its equitable discretion in like cases"). In that case, the government argued, among other things, that the plaintiffs failed to challenge final agency action under the APA. *See AFSCME*, No. 24A1063, Application for Stay 21-24 (May 2, 2025). As in this case, the plaintiffs in *AFSCME* argued that the agency "granted access to DOGE team members too quickly and without adequately vetting those employees, providing them with sufficient training, or correctly assessing their need for access to SSA systems." *Id.* at 22. The government urged, as it does here, that those types of access decisions fall within the day-to-day management and operation of an agency, and do not constitute agency action susceptible to APA review. *Id.* Although the bases for the Supreme Court's decision are not spelled out in its decision, ultimately, in the face of identical arguments, the Court concluded that preliminary injunctive relief restraining the

37

agency (there, SSA) was inappropriate, and stayed that relief. *SSA v. AFSCME*, 145 S. Ct. 1626 (2025).

Similarly, in *AFT v. Bessent*, the Fourth Circuit expressed substantial skepticism regarding whether similar systems-access claims can be brought under the APA, opining that "[t]he agency action here— granting IT access to certain employees—does not fit comfortably into" the definition of agency actions that are subject to APA review. 152 F.4th at 174 (also observing that the agency decision did not fit comfortably into the list of decisions that "traditionally fail" the final agency action test, but concluding challengers had not shown likelihood of success). In different contexts, other courts have also recently denied APA review of "informal" agency actions that, like the Access Plan challenged here, did not mark the consummation of a decisionmaking process, did not directly affect plaintiffs' legal rights, and were insufficiently discrete. *See, e.g.*, *Vought*, 149 F.4th at 781-85 (internal guidance email and putative decision to shut down an agency are not final agency actions).

In short, the agency decisions the states challenge in this action are the type of day-to-day management choices that the APA insulates from judicial oversight. Because at its core the states' lawsuit seeks to interfere with that kind of decisionmaking, the district court was incorrect in concluding that there is final agency action at issue here, and its preliminary injunction was improperly granted.

38

## CONCLUSION

**The district court's order granting a preliminary injunction should be vacated.**

Dated:      New York, New York
            December 22, 2025

                    Respectfully submitted,

                    JAY CLAYTON,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for Defendants-Appellants.*

REBECCA S. TINIO,
BENJAMIN H. TORRANCE,
    *Assistant United States Attorneys,*
            *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 8902 words in this brief.

JAY CLAYTON,
*United States Attorney for the*
*Southern District of New York*

By: REBECCA S. TINIO,
*Assistant United States Attorney*